UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

UNITED STATES OF AMERICA

                                       :

        -v.-

                                       :      S2 09 Cr. 338 (RMB)

MICHAEL HOWARD CLOTT,
  a/k/a "Michael Howard,"               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


PREET BHARARA
United States Attorney for the
Southern District of New York,
*Attorney for the United States*
*of America*

AMIE N. ELY
MICHAEL LOCKARD
Assistant United States Attorneys
 - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:

UNITED STATES OF AMERICA

:

       -v.-

:     S2 09 Cr. 338 (RMB)

MICHAEL HOWARD CLOTT,
 a/k/a "Michael Howard,"     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

We write in advance of the sentencing of Michael Howard Clott, a/k/a "Michael Howard," (the "defendant" or "Clott"), which is currently scheduled for February 16, 2012, at 2:30 p.m. For the reasons set forth herein, the Court should sentence Clott, who is a dangerous white-collar recidivist, to a term of imprisonment within the Stipulated Guidelines Range of 259 to 317 months' incarceration, and should impose forfeiture and restitution.

### Background

**I.**    **The Complaint and Indictment**

On or about March 9, 2009, the defendant self-surrendered and was presented on a complaint charging him with mail fraud, in violation of Title 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A. The conduct that resulted in these charges are discussed in Part II(A) and (B), below.

Following the defendant's arrest, the Honorable Frank Maas set bail, over the Government's objection, for the defendant in the amount of a $200,000 bond, secured by three cosigners and $10,000 cash. The defendant was released on his own signature. The conditions

2

were modified on March 19, 2009, to extend the time by which the defendant was required to post the cash component of his bond to March 27, 2009, and to increase the cash component to $100,000, which was to be posted by March 20, 2009.  The bond was signed by the defendant and co-signed by Clott's children, Erin S. Clott and Ryan B. Clott, and by John Murray, Esq.  The cash component of the bond was paid by Bjorn Koritz, an attorney and business associate of Clott's.  As described below, the defendant provided Koritz with the $100,000 for bail from proceeds of a fraudulent scheme that Clott continued to perpetrate while on bail.

On April 7, 2009, a grand jury sitting in the Southern District of New York returned an indictment charging the defendant with mail fraud, in violation of Title 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.  The case was assigned to Your Honor.  See Indictment, United States v. Michael Howard Clott, 09 Cr. 338 (RMB), attached as Exhibit A.

## II.      The S1 Information

After Clott was charged in the Indictment, the Federal Bureau of Investigation learned that Clott had defrauded additional victims in another scheme.  Clott agreed to waive indictment and to enter a guilty plea to an Information that charged him with the frauds about which the Government knew, and over which this Office had jurisdiction, including those set forth in the underlying Indictment and the new scheme. See S1 Information, United States v. Michael Howard Clott, S1 09 Cr. 338 (RMB), attached as Exhibit B (the "S1 Information").  The S1 Information, which was filed December 14, 2009, charged the defendant in four counts.  Count One of the Information charged the defendant with committing mail fraud, in violation of Title 18, United States Code, Section 1341 and 2.  Count Two of the Information charged the

defendant with committing wire fraud, in violation of Title 18, United States Code, Section 1343 and 2.  Count Three of the Information charged the defendant with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A and 2.  Count Four of the Information charged the defendant with committing wire fraud, in violation of Title 18, United States Code, Section 1343 and 2.

### A.    The Margate Apartment Scheme: January 2008 to May 2008

In early 2008, Clott represented to a victim, referred to as "Victim-1" in the S1 Information, that he would help Victim-1 purchase an apartment located in Margate, New Jersey, about which Victim-1 had expressed an interest (the "Margate Apartment").  (S1 Information ¶¶ 1-2).  To conceal his identity, Clott represented himself to be "Michael Howard."  (Id. at ¶ 2).  As discussed in Part VI, below, at the time he was defrauding Victim-1, Clott had five previous federal fraud convictions.  Searches for Clott's name on the internet yield articles about some of these convictions as well as civil lawsuits in naming Clott as a defendant.

Clott mailed a check to Victim-1 for $859,000, which he represented was a loan to use to purchase the Margate Apartment.  (Id. at ¶ 3).  Clott directed Victim-1 to deposit the check in an account controlled by a lawyer with whom Clott was working and told Victim-1 that the money would be used to purchase the Margate Apartment.  (Id.).  Clott well knew that the money would not be used to purchase the apartment and, indeed, the check bounced, unknown to Victim-1.  (Id. at ¶ 4).  Clott nonetheless sought repayment of this $859,000 "loan" from Victim-1, who paid Clott $455,000 that Victim-1 borrowed from others.  (Id. at ¶¶ 4-5).  Count One of the S2 Information charges Clott with mail fraud in connection with this fraudulent scheme. (Id. at ¶ 6).

Victim-1 has submitted a victim impact statement to the Court, in which he requests restitution and notes that he has incurred $85,000 in expenses, in addition to the $455,000 and

his partners lost in the above-described scheme. In addition to the loss of time and money, Victim-1 notes that Clott's fraud caused irreparable damage to Victim-1's reputation.

### B.        The Fraudulent Power of Attorney Scheme: May 2008

Around the same time he was defrauding Victim-1, Clott engaged in another fraudulent scheme in an attempt to obtain over $1 million.  (Id. at ¶¶ 4-5.)  In this scheme, Clott sought to obtain a mortgage loan on a property located in Purchase, New York (the "Purchase Property") by falsely representing that the property's owner, referred to in the S1 Information as "Victim-2," provided him with a power of attorney over the property.  (Id. at ¶¶ 8-9).

At the closing for this mortgage, Clott presented a document purportedly signed by Victim-2 providing him with power of attorney over the Purchase Property.  (Id. at ¶ 9).  As Clott knew, however, the power of attorney was forged.  (Id. at ¶ 9).  Clott again used the alias "Michael Howard."  (Id. at ¶ 10).  However, when required to verify his identity at the closing, Clott provided a driver's license in his true name, Michael Howard Clott.  (Id. at ¶ 10).  A lawyer who was present at the closing later searched the internet using Clott's true name and learned that Clott had previously been convicted of a fraud offense.  This lawyer then directed the bank to stop payment on the wire transfers disbursing the proceeds of the mortgage.  (Id. at ¶¶ 10, 12).  Count Two of the S1 Information charges Clott with wire fraud in connection with this conduct, and in Count Three of the S1 Information with aggravated identity theft for his unlawful use of Vicvtim-2's means of identification in connection with the scheme.  (Id. at ¶¶ 13, 15).

### C.        The Maryland Real Estate Scheme: July through September 2008

Just a few months after defrauding Victim-1 of $455,000 and the foiled attempt to obtain a $1.25 million mortgage on Victim-2's property, Clott defrauded a family in Maryland of approximately $200,000 by representing that he was going to invest their money in real estate.

(Id. at ¶¶ 17-18).  After obtaining approximately $50,000 from a married couple (referred to in the S1 Information as "Victim-3" and "Victim-4") and providing them with a forged receipt on Fidelity Investment letterhead, Clott falsely reported to them that they would receive a 27 percent return on their investment.  (Id. at ¶¶ 19, 21).  As a result of Clott's false assurances, the wife's parents invested a total of $150,000 with Clott. (Id. at ¶ 21).  Clott simply misappropriated the money.  When Victim-3 and Victim-4 complained about his misappropriation, Clott threatened to sue them.  (Id. at ¶ 23).  Count Four of the S1 Information charges Clott with wire fraud in connection with this fraudulent scheme.  (Id. at ¶ 26).

### D.        Clott's Plea Agreement And Guilty Plea to the S1 Information

The defendant pleaded guilty before the Honorable James C. Francis, IV, to the S1 Information on the date it was filed, December 14, 2009.  The plea was pursuant to a plea agreement in which the parties agreed that the Counts One, Two, and Four would be grouped together; that Section 2B1.1 of the Guidelines applied to the defendant's conduct on those Counts, that the defendant's base offense level under that Guideline was 7; and that the applicable loss amount was between $1 million and $2.5 million, resulting in a 16-level increase in the defendant's offense level under Section 2B1.1(b)(1)(I).  If the defendant clearly demonstrated acceptance of responsibility, the parties agreed that a three-level reduction in his offense level would be appropriate under Section 3E1.1(a) and (b).  As a result, the defendant's stipulated offense level on Counts One, Two, and Four was 20.  (See Exhibit C).

Clott's criminal history included five prior federal fraud convictions, for which he was sentenced to between 18 and 150 months' incarceration, which are detailed in Part VI, below; a term of supervised release that he was still serving at the time of the offenses charged in the S1 Information; and release from prison less than two years before he began committing the

offenses charged in the S1 Information, resulting in a total of 18 criminal history points. The parties stipulated that this extensive criminal history placed Clott in Criminal History Category VI. With an offense level of 20 and a Criminal History Category of VI, his Stipulated Guidelines Range on the S1 Information was 94 to 111 months' imprisonment, calculated as follows: 70 to 87 months on Counts One, Two, and Four, to be followed by a mandatory consecutive two years on Count Three.

During Judge Francis's careful and thorough hearing that complied in all respects with the requirements of Rule 11 of the Federal Rules of Criminal Procedure, Clott admitted his guilt on Counts One through Four of the S1 Information. Plea Tr. at 13-16, United States v. Michael Howard Clott, S1 09 Cr. 338 (RMB) (Dec. 14, 2009), attached as Exhibit D.

## III.    Clott's Flight

Following the defendant's guilty plea, Your Honor ordered the defendant to appear for the acceptance of the plea on December 22, 2009. The Government learned the day before the plea acceptance hearing that it appeared that Clott was continuing to defraud additional victims.[1] Pursuant to Title 18, United States Code, Section 3143, which shifts to the defendant the burden of proving that he is not a risk of flight or a danger to the community after he has entered a guilty plea, the Government sought the defendant's remand at the time his plea was accepted.

The Court set a bail revocation hearing for the next morning, December 23, 2009, and Clott did not appear. (See United State v. Michael Howard Clott, Dec. 23, 2009 Tr., attached as Exhibit E). The Court then issued a warrant for the defendant's arrest.

Clott was arrested on April 21, 2010, near Boston, Massachusetts.

---

[1] These allegations form the basis for the charges in the S2 Information, to which Clott entered a guilty plea on July 29, 2011.

IV.     **The Charges in the S2 Information**

During the time Clott was released on bail in connection with the charges in the Complaint and S1 Information, Clott was engaged in yet another serious fraud to obtain obtain access to over $9 million.

Following Clott's April 21, 2010, arrest, Clott agreed to plead guilty to a second superseding Information (the "S2 Information," attached as Exhibit F) charging this additional fraud (Count One) and bail jumping (Count Two) pursuant to a plea agreement, as summarized below, that would encompass all the criminal charges in the Southern District of New York.

A.      **The Real Estate Company Investment Scheme: 2009**

In 2009, Clott fraudulently induced a real estate company (which was referred to in the S2 Information as the "Investment Company") to provide him with approximately $9.1 million dollars, which he falsely represented would be used in real estate investment programs.  (S2 Information ¶¶ 4-5).  As with the Margate Apartment Scheme and the Fraudulent Power of Attorney Scheme, Clott held himself out as "Michael Howard" in his dealings with the Investment Company.  Clott promised that the funds the invested funds would be placed in escrow accounts, where they would not be withdrawn.  (Id. ¶ 5).  Clott promised that the Investment Company and its investors would receive a fee for each real estate transaction that was completed while their funds were held in escrow.  (Id. ¶ 6).  Clott caused funds provided by the Investment Company and its associates to be transferred for his own use and the use of his family members, including sending approximately $50,000 to his son in New York and purchasing a hair salon/spa for $1.3 million for his daughter.  (Id. at ¶¶ 9(a), 9(b)).  Clott misappropriated a total of approximately $5.6 million.  (Id. at ¶¶ 4-5).  Count One of the S2 Information charges Clott with committing wire fraud while on pretrial release in connection with this conduct.

During this fraud, Clott employed the services of a woman who immigrated from Vietnam as a 17-year old, and who worked in the mortgage industry before she met Clott. This woman has submitted a victim impact statement in which she describes her upbringing, education, and the career she enjoyed before she met Clott. She describes meeting "Michael Howard" in October 2008—around the time Clott was victimizing the Maryland family who invested $200,000 with him. He soon offered her a job, and, not long after that, asked her to put an escrow account in her name. This was one of the escrow accounts used to siphon money from the $9.1 million the Investment Company and its associates invested with Clott. In her impact statement, the woman describes working for Clott until her husband, an attorney who had also been dealing with Clott, discovered his true name and his criminal past. After that, she describes receiving several telephone calls from Clott that alarmed her, and learning that Clott had forged her name on an apartment he was using, and on that apartment's utility bill. She also describes being named as a defendant in a civil suit brought by the Investment Company and others, and incurring over $100,000 in legal fees during the course of that litigation.

**B.      Clott's Plea Agreement And Guilty Plea to the S2 Information**

In the parties' plea agreement, Clott agreed to enter a guilty plea to both counts of the S2 Information, and the parties agreed that the plea agreement replaced and superseded the plea agreement to which Clott entered his plea to the S1 Information. As a result of the charges in both the S1 and S2 Informations, Clott faces a maximum term of imprisonment of 102 years' imprisonment, with a mandatory minimum sentence of two years' imprisonment as a result of the charges set forth in Count Three of the S2 Information.

Additionally, the parties agreed to the following Guidelines stipulations: a base offense level of 7, pursuant to Section 2B1.1(a)(1); because the loss amount is between $7 million and

$20 million, a 20-level increase in the offense level, pursuant to Section 2B1.1(b)(1)(K); because the offense involved 10 or more victims, a 2-level increase, pursuant to Section 2B1.1(b)(2); because the offense involved sophisticated means, a 2-level increase, pursuant to Section 2B1.1(b)(9)(C); because the defendant committed the crimes in the S2 Information while on pretrial release for the crimes set forth in the S1 Information, a 3-level increase, pursuant to Section 3C1.3; and because the defendant failed to appear for a judicial proceeding, a 2-level increase pursuant to Section 3C1.1.  If the defendant clearly demonstrated acceptance of responsibility, the parties agreed that a three-level reduction in his offense level would be appropriate under Section 3E1.1(a) and (b).  In accordance with the above, the parties agreed that the defendant's offense level is 33.

While the defendant's criminal history category was reduced by one point, as the Sentencing Guidelines no longer provide a one-point increase for committing the instant offense within two years of release from a term of imprisonment, the defendant remained in Criminal History Category VI as he had 17 criminal history points.  With an offense level of 33 and a Criminal History Category of VI, the defendant's new Stipulated Guidelines Range of the charges set forth in the S1 and S2 Information is 259 to 317 months' imprisonment, calculated as follows: 235 to 293 months' imprisonment on Counts One, Two, and Four of the S1 Information and Counts One and Two of the S2 Information, to be followed by a mandatory two years' imprisonment on Count Three of the S1 Information.

Clott entered his guilty plea before the Honorable Ronald L. Ellis on July 29, 2011.  Plea Tr. at 13-16, United States v. Michael Howard Clott, S1 09 Cr. 338 (RMB) (July 29, 2011), attached as Exhibit H.  During a hearing that complied in all respects with the requirements of Rule 11 of the Federal Rules of Criminal Procedure, Clott admitted his guilt on Counts One and

Two of the S2 Information.  Id. at 18-22.  Your Honor accepted Clott's guilty plea during a hearing held on September 26, 2011.

## V.      Clott's Pending Charges in Massachusetts

While Clott was a fugitive from late 2009 through mid-April 2010, he allegedly committed additional frauds.  As a result of his conduct, mail and wire fraud charges are pending against him in the District of Massachusetts.  See United States v. Michael Howard Clott, 10 Cr. 10361 (RWZ), attached as Exhibit I.

## VI.     Clott's Prior Federal Convictions

Beginning in the mid-1980s, Clott engaged multiple fraudulent schemes, and has not been deterred even during lengthy periods of incarceration.  Indeed, his victims include other inmates with whom he was incarcerated.

### A.      The FAMCO Scheme: 1982 to 1985 (87 Cr. 0313 (FNS) (D. Md.))

Clott founded First American Mortgage Company ("FAMCO") in 1979.  See, e.g., Dean Calbreath, False Fortune, Warfield's, 62, 62 (Sept. 1989), attached as Exhibit J ("Exhibit J") From approximately October 1982 through November 1985, Clott used FAMCO to defraud investors and to provide mortgages at incredibly high rates to vulnerable borrowers.  (Id. at 65; Indictment in United States v. Michael H. Clott, S-87-0313, at ¶¶ 6-18, attached as Exhibit K ("Exhibit K")). According to a press account, Clott staffed FAMCO with unsophisticated employees who "had little or no experience in the mortgage or investment field." (Exhibit J at 65).  Clott's fraudulent activity included selling the same mortgage to multiple investors, and lying to savings and loans and the brokerage firm E.F. Hutton.  (Id. at 63-64).  As a result of these crimes, the United States Attorney's Office for the District of Maryland charged Clott with operating FAMCO as a racketeering enterprise.  (Exhibit K).

11

Clott entered a guilty plea to these charges in July 1987, (Exhibit J at 64), and was sentenced to 150 months' incarceration and $1 million in restitution by the Honorable Frederic Smalkin.  (Judgment in <u>United States</u> v. <u>Michael H. Clott</u>, S-87-0313, attached as Exhibit L). During Clott's sentencing, Judge Smalkin characterized the crime as "one of the largest [frauds] ever brought to prosecution in the federal system in this district.  It involved victims ranging from the biggest and most sophisticated institutions in this country to people who lost their total life savings." (Exhibit J at 64).  In all, individual and corporate investors lost more than $15 million as a result of Clott's scheme.  (Gov'ts Resp. to Def.'s Sent. Memo, Sept. 29, 1995,  at 1, attached as Exhibit M ("Exhibit M")).

**B.**     **The First Capital Mortgage Co. Scheme: 1987 (S-87-0190 (FNS) (D. Md.))**

After the criminal investigation into FAMCO began, it went out of business.  (Exhibit M at 1).  Clott began perpetrating a new fraudulent scheme under a new name: First Capital Mortgage Co.  (<u>Id.</u>).  As a result of this fraud, he was again charged, under S-87-0190, convicted as a result of a guilty plea, and sentenced to a 120-month term of imprisonment on Count One, to run concurrently with the sentence imposed for the FAMCO scheme, a suspended sentence of sixty months' incarceration on Count Two, and probation for a period of five years.  (<u>Id.</u> at 1-2).

**C.**     **Bank Fraud While Pending BOP Designation: 1989 (89-0224 (JRH) (D. Md.))**

While Clott was residing at the Volunteers of America, pending his sentencing and Bureau of Prisons ("BOP") designation for his convictions in the FAMCO and First Capital Mortgage Co. schemes, he committed another fraud that resulted in a loss of approximately $202,000 to the victims.  (<u>Id.</u> at 2).  He was again charged by the U.S. Attorney's Office for the District of Maryland, and entered a guilty plea.  (<u>Id.</u> at 2).  The Honorable John R. Hargrove

sentenced him to a term of 18 months of incarceration, to run consecutive to his two convictions

in the 1987 cases.  (Id.).

### D.   Defrauding Victims While Incarcerated: 1992 (96 Cr. 323 (LEK) (N.D.N.Y.) & S-96-0384 (FNS) (D. Md.))

While Clott was incarcerated at the Raybrook Federal Correctional Institutional, he

continued to defraud more victims.  (Information in United States v. Michael H. Clott, 96-CR-

323 LEK, attached as Exhibit N ("Exhibit N")).  For several months in 1992, Clott defrauded three

victims—inmates or the family members of inmates—of the proceeds they received from loans that

he orchestrated.  (Id. at ¶¶ 1-5).  Clott used at least one bank account in the name of one of his

then-minor children to obtain the proceeds of the frauds.  (Id. at ¶ 4(c); see also Statement of

Facts S-96-0384, attached as Exhibit O ("Exhibit O")).  As a result of these crimes, Clott was

charged in the Northern District of New York, under 96 Cr. 323 (LEK), which charges was

transferred pursuant to Rule 20 of the Federal Rules of Criminal Procedure to the District of

Maryland, under S-96 Cr. 0384 (FNS).  Clott entered a guilty plea to these charges and was

sentenced to 60 months' incarceration and three years of supervised release.

### E.   The Phoenix Scheme—Defrauding Homeowners: 1994 to 1995 (96 Cr. 0368 (FNS) (D. Md.))

Clott was released from prison on May 6, 1994.  (Exhibit M at 2).  Clott was prohibited,

under the terms of a Consent Decree he signed with the State of Maryland, from engaging in the

mortgage and/or securities business in the State of Maryland.  (Information in United States v.

Michael H. Clott, 96 Cr. 0368, at ¶ 1, attached as Exhibit P ("Exhibit P")).  Clott nonetheless

persuaded homeowners to refinance second mortgages using a company called Phoenix

Financial Services, Inc. ("Phoenix"), enticing them with an opportunity to refinance their entire

second mortgage and obtain an additional equity line of credit funding at a rate of 7.5 percent.

13

(Id. at ¶ 10).  The homeowners would settle with a legitimate mortgage company, then turn over

the checks they received from that legitimate mortgage company to Clott and his associates at

Phoenix or another company affiliated with the scheme.  (Id. at ¶ 11).  Clott and his associates

would then falsely tell the homeowners that their checks would be used to pay off one or more

existing mortgages on the homeowners' residences and that Phoenix would refinance their loan

with a new mortgage at a rate of 7.5 percent interest over 30 years.  (Id. at 12, 14.  Instead, the

checks went into accounts that Phoenix and Clott controlled, and the prior mortgages remained

on the homeowners' residences.  Id. at 13.

Through this scheme, Clott and his associates obtained approximately $2.5 million from

homeowners, and Clott himself converted at least $1.3 million of that amount to his own

personal use.  (Id. at ¶ 16; see also Statement of Facts, attached as Exhibit R ("Exhibit R")).  Clott

once again used bank accounts in his children's names to deposit his victims' funds, and used

these funds to purchase, among other things, a $650,000 home, a new vehicle, and jewelry.

(Exhibit R at 9, 12).  While Clott was enjoying his new home (which he bought in a business

associate's name, id. at 9-10, to try to hide that he was again engaging in lucrative mortgage

fraud, see Joe Matthews, Swinder Who Did His Time is Back in Jail, Balt. Sun, 1B (July 25,

1995), attached as Exhibit S), his victims were struggling with foreclosures and financial and

credit-related problems.  (Exhibit R at 12-13).

After waiving indictment, Clott entered a guilty plea to charges related to this conduct.[2]

Tom Johnson, Ex-First American Mortgage Chair Pleads Guilty for Fraud (Again): Clott Went to

Prison Once Before on a Refinance Scheme; He Faces More Time for Phoenix Financial

---

[2] Judge Harwood also found that Clott violated his supervised release in 89 Cr. 224.  (Related
Case Memo, attached as Exhibit Q; Exhibit M at 2-3; and Joe Matthews, Swinder Who Did His
Time is Back in Jail, Balt. Sun, 1B (July 25, 1995), attached as Exhibit S).

Dealings, Daily Record (Balt., Md.), 13 (Nov. 7, 1996), attached as Exhibit T; Scott Higham,

Mortgage Schemer Admits Guilt; He Swindled $1.3 Million from Homeowners, Balt. Sun, 1B

(Nov. 7, 1996), attached as Exhibit U; see also Plea Agreement, United States v. Michael Clott,

July 26, 1996, attached as Exhibit V).

 In its sentencing submission, the U.S. Attorney's Office for the District of Maryland

objected to the reduction of his offense level for acceptance of responsibility, as that office

contended that Clott defrauded another inmate, unbeknownst to the Government, shortly before

entering his guilty plea.  (Government's Sentencing Memorandum, United States v. Michael H.

Clott, S-96-0368, S-96-0384, Jan. 31, 1997, attached as Exhibit W).  That Office argued that

Clott was "an incorrigible criminal.  Since 1982[,] whether incarcerated or not, Clott has

continuously defrauded, or attempted to defraud, countless victims," and detailed Clott's crimes

while incarcerated, through which he sent hundreds of thousands of dollars to his former wife,

Alisa Liebowitz, and his two children by defrauding other inmates and their families. (Id. at 5, 6-

7).  Given Clott's ongoing and significant frauds, and the financial vulnerability of many of his

victims, the U.S Attorney's Office for the District of Maryland requested that the Court find that

an upward departure, pursuant to Section 4A1.3 of the Sentencing Guidelines, was appropriate,

given that his criminal history category did not adequately reflect his part criminal conduct or the

likelihood that he would commit other crimes.  Id. at 8.  The Government also summarized the

"compelling and often tragic" stories of some of Clott's most recent victims.  Id. at 12-13.  At least

one of those victims lost his home.  Id. at 12.  Another had to transfer to the midnight shift at his

job, and was forced to postpone his retirement for an additional five to seven years to pay off the

second mortgage that Clott and Phoenix stole.  Id. at 13.  An elderly woman attributed her

husband's stroke to "stress and worry" caused by Clott's fraud.  Id. at 13.

15

During Clott's sentencing, Judge Smalkin sentenced Clott to 150 months' incarceration,
lamenting that he could not "think of anything beyond transporting him beyond the Seven Seas," to
prevent Clott from "steal[ing] money," and concluding that even if Clott were sentenced to a desert
island, "[h]e'd fleece the pigeons that landed there." (Scott Higham, Swindler Draws Top Sentence,
12 ½ Years; Scheme Netted Millions From Duped Homeowners, 2B, Balt. Sun (Feb. 8, 1997),
attached as Exhibit X ("Exhibit X"); see also Judgment, United States v. Michael Howard Clott, 96
Cr. 369, attached as Exhibit Y). According to press accounts, nearly 50 of Clott's victims from
the Phoenix scheme attended his sentencing. (Exhibit X).

## DISCUSSION

For the reasons set forth below, a sentence with the defendant's advisory Guidelines range
of 259 to 317 months' imprisonment would be sufficient, but not greater than necessary, to
comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2), following
consideration of all the factors set forth in Title 18, United States Code, Section 3553(a).

## I.      Sentencing Standards

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to
the Court in light of United States v. Booker, 543 U.S. 220 (2005) and United States v. Crosby,
397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory,
it held also that the Guidelines remain in place and that district courts must "consult" the
Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court
stated, "a district court should begin all sentencing proceedings by correctly calculating the
applicable Guidelines range"–that "should be the starting point and the initial benchmark." Gall v.
United States, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined

in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). Gall v. United States, 128 S. Ct. at 596 n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical

17

evidence derived from the review of thousands of individual sentencing decisions," Gall, 128 S. Ct. at 594; see also Rita v. United States, 127 S. Ct. at 2464.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 127 S. Ct. at 597.

## II.   The Court Should Apply The Guidelines Stipulations Set Forth in the Parties' Plea Agreement

As set forth above, Clott's plea to the S2 Information was pursuant to a plea agreement which covered both the charges in the S1 Information and those in the S2 Information.  (See Exhibit G).  As a result of this disposition, Clott was able to ensure that he was sentenced for these somewhat disparate crimes in one proceeding before Your Honor.[3]

## III.   A Sentence Within The Guidelines Range Would Appropriately Reflect The Nature and Circumstances Of The Offense And The History And Characteristics Of The Defendant, Promote Respect For The Law, Protect the Public, And Provide Just Punishment

Clott is dangerous white collar recidivist. Since the mid-1980s, he has engaged in numerous frauds, and has not been deterred by lengthy prison sentences.  Indeed, when he was in prison in the mid-1990s, he victimized some of the inmates with whom he was incarcerated.  He was on supervised release when he committed the first of the schemes to which he has pled guilty before this Court; on pretrial release before this Court when he committed the fraud set forth in the S2 Information; and faces charges in Massachusetts for allegedly defrauding still more victims after he failed to appear before Your Honor.

The crimes to which Clott pled guilty before this Court are serious.  He systematically

---

[3] As defense counsel has not submitted a sentencing submission as of the submission of this Memorandum, the Government respectfully requests leave to reply to any arguments the defendant may make about the appropriateness of the enhancements set forth in the plea agreement.

gained the trust of people around him, often by concealing his true identity; offered many of them promises of sure-fire investments; and then, as he had done so many times before, abused the trust of his victims and stole their money.  In his victim impact statement, Victim-1 from the Margate Apartment Scheme (described in Background, Part II(A)) says that Clott's conduct caused "irreparable damage to [his] reputation[,] professionally and personally."  In her impact statement, one of the women who was involved in the Real Estate Company Investment Scheme (described in Background, Part IV(A)) outlines how she met Clott—as, again, "Michael Howard"—and the work she did for him.  She describes learning that Clott forged her name, and a threatening call she received from him.  She describes being sued civilly in connection with the work she did for Clott and others.  Both of these victims, and others, lost money and time, and their reputations were tainted by their association with Clott.

Clott's 17 Criminal History Points put him well above the 13 required to be in Criminal History Category VI, and support imposing a sentence within the Stipulated Guidelines Range. Clott's prior criminal convictions—all for fraud-related offenses—show that he is an incredibly persuasive, and quite dangerous, white collar criminal, who has been neither rehabilitated nor deterred by his prior convictions and sentences.  It appears that Judge Smalkin was prescient when he observed in 1997 that if Clott were sentenced to a desert island, "[h]e'd fleece the pigeons that landed there." (Exhibit X).

A sentence within the Stipulated Guidelines Range is necessary to protect the public from further crimes of the defendant and to provide just punishment for the crimes for which he will be sentenced.  Clott was not deterred by being supervised on probation, or on pretrial release; in fact, he committed much of the Real Estate Company Investment Scheme while on pretrial services supervision, which supervision included electronic monitoring. Only incarceration

19

appears to be a (reasonably) effective means of protecting the public. Given the number of separate crimes for which Clott will be sentenced—and the benefit to him, under the Guidelines, of grouping these crimes in one sentencing—a sentence below the Stipulated Guidelines Range would not provide just punishment or protect the public.

Accordingly, in light of all the factors set forth in Title 18, United States Code, Section 3553(a), the policies set forth in the advisory Sentencing Guidelines, the facts set forth in the PSR, and the arguments above, a sentence between 259 to 317 months' imprisonment would be sufficient but not greater than necessary to comply with the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a)(2).

**IV.     The Court Should Impose Forfeiture and Restitution**

**A.     Forfeiture**

Clott agreed in the S2 plea agreement to forfeit a total of $5,016,996. The Court should impose forfeiture in that amount.

**B.     Restitution**

The Government seeks, on behalf of the Victims 1-4, the restitution amounts set forth on page 31 of Clott's Presentence Investigation Report ("PSR"): $100,000 for Victims 1 and 2, and $200,000 for Victims 3 and 4.

We have received additional information from the victims of the Real Estate Investment Company Scheme that reduces Clott's restitution obligation to them. Because of a civil suit that has been settled, and based on representations by counsel for those victims about the amounts that have been recovered during that civil litigation, those victims are owed less than the approximately $4.3 million set forth in the PSR. We will provide, in advance of Clott's sentencing, a proposed restitution order that sets forth the appropriate amounts owed to each

victim.

## **CONCLUSION**

For the reasons stated herein, the Court should sentence Michael Howard Clott, a/k/a

'Michael Howard,' to a term of incarceration of between 259 to 317 months, and impose forfeiture

and restitution.

Dated:  New York, New York
       February 9, 2012

                                  Respectfully submitted,

                                  PREET BHARARA
                                  United States Attorney for the
                                  Southern District of New York
                                  Attorney for the United States
                                       of America

               By:     ____/s_____
                                  AMIE N. ELY/ MICHAEL LOCKARD
                                  Assistant United States Attorneys
                                  (212) 637-2214/ 2193

AFFIRMATION OF SERVICE

AMIE N. ELY, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on February 9, 2012, I caused one copy of the within Memorandum of Law to be served by ECF on:

Charles S. Hochbaum
16 Court Street, Suite 1800
Brooklyn, New York 11241
718-855-4800
Email: crimdefend@aol.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:     New York, New York
           February 9, 2012

_/s_____
AMIE N. ELY